IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADE GENERAL, INC.,               )
                                     )    No.   05-1334-HU
                  Plaintiff,         )
                                     )
     v.                              )
                                     )    OPINION
                                     )
                                     )
POWERHOUSE DIESEL SERVICES,          )
INC.,                                )
                                     )
                  Defendant.         )
_____    )

Jill Schneider
Schwabe, Williamson & Wyatt
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
     Attorney for plaintiff

Robert L. Aldisert
Cody M. Weston
Perkins Coie
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209
     Attorneys for defendant

HUBEL, Magistrate Judge:

     This is a breach of contract case brought by plaintiff Cascade

General, Inc. ("Cascade") against Powerhouse Diesel Services, Inc.

OPINION Page 1

("Powerhouse"). The action was tried to the court.

## Findings of Fact

On March 11, 2004, Cascade contracted with the State of Alaska to refurbish the machinery and ship systems aboard the M/V Columbia (the vessel) for the Alaska Marine Highway System ("AMHS"). Powerhouse had assisted Cascade in the development of the bid specifications for the overhaul of the main propulsion engines, and on February 2, 2004, submitted a bid for the engine overhaul. Powerhouse's bid was $1,409,720.20. Exhibits 6, 512. Powerhouse's bid included a 24-week production schedule commencing from the date of sea trials to the commissioning of the engines.

The schedule was apparently based on five-day weeks, and called for four weeks (20 work days) to disassemble the engines, eight weeks (40 work days) of "demobilization," when some disassembled engine parts would be replaced, repaired, or reconditioned in Powerhouse's California shop, and 12 weeks (60 work days) to reassemble the engines.[1] Exhibit 6. The bid included testing and documentation. Exhibit 512.

Cascade incorporated Powerhouse's bid for the engine work into its $7,083,043 bid for the overhaul of the vessel. On June 16, 2004, the State of Alaska officially accepted Powerhouse as the subcontractor for the main engine overhaul. The contract between Cascade and AMHS called for two sea trials. The first sea trials, prior to the vessel's arrival at the shipyard in Portland, were to

---

[1] The evidence is conflicting on how many hours a day the Powerhouse crew worked or planned to work. See Exhibit 517 and deposition testimony of William Arthur.

OPINION Page 2

establish baseline systems performance. The second trials were to occur after the overhaul period, to compare performance to the original baselines.

On March 17, 2004, Cascade forwarded a Purchase Order for Powerhouse's work on the engines. Exhibit 7. The forwarding letter with the Purchase Order specified that all of the General and Special Conditions, Drawings, Specifications, Addenda, Amendments, Modifications and other documents made part of the contract between Cascade and AMHS would be incorporated into the subcontract between Powerhouse and Cascade. Id. The letter also provided that payment for materials and equipment would be made 30 days from the date that the onsite AMHS inspector accepted the material or equipment and authorized its use on the project; that payment for labor would be made bi-weekly based upon physical progress as agreed to by Cascade; and that Cascade would withhold warranty retention from the invoices submitted by Powerhouse.[2] Id.

Cascade sent Powerhouse documents titled "Required Subcontractor Clauses." Exhibit 7. Among other things, the subcontractor clauses provided that the prime contractor agreed to pay the subcontractor for satisfactory performance within eight working days after receiving payment from the State of Alaska; that the prime contractor would pay the subcontractor interest on any amounts not paid within eight working days after receiving payment from the state, in the amount of 10.5%, commencing the day after

---

[2] Between September 16, 2004 and April 15, 2005, Cascade withheld $83,169 on this basis.

OPINION Page 3

the eighth working day; and that the prime contractor would pay the subcontractor interest on retainage at the rate of 10.5%. _Id._

On March 19, 2004, Jim Jones, president of Powerhouse, accepted the subcontract and signed a copy of the forwarding letter setting out the terms of the subcontract. _Id._

The subcontract between Cascade and Powerhouse provided for work sequencing and scheduling as follows:

3.3 <u>Work Sequence and Schedule</u>

The time-frame for main engine overhaul and foundation inspections described in this section of these specifications, shall be separate and distinct from the Engine Room systems work (Section 4 of these specifications), the main engine and aux machinery exhaust systems modifications (Section 5 of these specifications), and the main propulsion overhaul work on the shafts, bearings, seals and CPP systems (this section of these specifications).

Two mutually exclusive, non-concurrent Work Groups are established as follows:

**Work Group 1**

Main engine overhauls (Section 3.6 of these specifications), and

Main engine and reduction gear foundation inspections (Section 3.7 of these specifications)

**and**

**Work Group 2**

Shaft bearing and seals overhauls (Section 3.10 of these specifications),

CPP systems (Section 3.11 of these specifications)

Engine Room systems modifications (Section 4 of these specifications),

Main engine exhaust systems modifications (Section 5 of these specifications).

OPINION Page 4

The Contractor may complete either Work Group 1 or Work Group 2 first at his option, within the context of the dry-docking date constraints stated in Section A.2 of these specifications.

Section 3.6 of the subcontract identified main engine overhaul as a Work Group 1 item, as defined in Section 3.3. See Exhibits 4, 508. The main engine systems, as defined in the contract between AMHS and Cascade, are engine blocks, cylinder blocks, cylinder heads and engine internals; built-on pumps, injectors, strainers, filters, pressure regulating valves, governors, alarms and safety systems; on-engine piping or piping components that leave and return to the main engine itself; on-engine piping to the points of connection to external systems; engine-mounted electrical components, transducers and switches; engine mounts; jacking screws; turbo-chargers and air-induction system; exhaust manifold system (between engine and turbo); on-engine fuel systems; engine controls and sensors; lube oil sump connections. Exhibit 4, 508, section 3.6.1.1.1.

Ancillary equipment to the main engine systems includes engine barring devices; vibration dampers; jacket water, intercooler, and lube oil coolers; jacket water, intercooler and lube oil Amot (thermostatic valves); specified lube oil swing check and three-way valves; and combustion air and control air mechanical gauges. Id.

The scope of Powerhouse's bid was "the work to be performed in relation to the main engine overhaul as defined in Section 3.6-Subsection 3.6.1.1.1." Exhibit 7. Powerhouse's bid for the engine work, including its manning schedules and budgets, was premised on the existence of the non-concurrent work groups, and on

OPINION Page 5

Powerhouse's unimpeded access to the engine room during the disassembly phase, as provided in Section 3.3 of the subcontract.

The prime contract between Cascade and AMHS permitted Cascade to perform any "nonpropulsion-related work," as well as work on the reduction gears and the torsional couplings "concurrently with the main engine overhaul work." Exhibit 4, Exhibit 508, ¶ 3.3. However, such concurrent work could

> only proceed if it is demonstrated to the owner's [i.e., AMHS's] satisfaction that it will not increase owner costs, negatively impact schedule, crew and vessel safety or otherwise impede, cause contamination of, or compromise the main engine work or sea trials. The Contractor's work sequence must be approved by the Owner in writing before any of the above tasks can commence in accordance with Section 1D.3 of these specifications.

Id. Powerhouse anticipated that Cascade would do its own work in the engine room during the demobilization period, when Powerhouse was expected to be manufacturing and refurbishing parts in California, with only a few of its people on board the vessel for clean up and inspection.

Dave Byers was the Cascade project manager. On June 2, 2004, at an engineering meeting following a pre-construction meeting, Byers informed AMHS that Cascade would not be able to complete the contract on schedule without being able to perform its own work concurrently with the main engine overhaul. Exhibit 511.

Thomas Atwood, AMHS's resident engineer, agreed that concurrent work could take place "if coordinated with engine overhaul." Id. Atwood recorded, "The only problem is that Powerhouse Diesel Engine Services was not at this meeting and not

OPINION Page 6

part of the discussion. Powerhouse position since vessel arrival at the shipyard is that Cascade General cannot be working in the engine room at the same time that they are working in the engine room." Id.

As Atwood recorded, and as other witnesses testified, no representative of Powerhouse was present at the meeting, and there is no evidence that AMHS or Cascade informed Powerhouse of the results of the meeting after it occurred. Atwood testified that AMHS's position was that, as prime contractor, Cascade could sequence the work to be done in the manner it chose.

AMHS's agreement on June 2, 2004, to allow Cascade to do concurrent work in the engine room indicates that AMHS was satisfied the decision to allow concurrent work would not increase owner costs, negatively impact schedule, or compromise the main engine work or sea trials if it was coordinated with engine overhaul. Atwood's weekly report dated February 12, 2005, Exhibit 511, establishes AMHS's written approval of the concurrent work in the engine room. But the evidence does not show that the concurrent work Cascade intended to do in the engine room was ever coordinated with the work of Powerhouse, the condition stated by Atwood on June 2, 2004. The court finds that the decision by Cascade and AMHS to permit concurrent work in the engine room, and Cascade's failure to coordinate its own work in the engine room with Powerhouse's engine overhaul, had a negative impact on the efficiency of both Powerhouse and Cascade, slowing both parties' main engine work,

///

OPINION Page 7

increasing costs, disrupting the schedule, and compromising the sea trials.

On September 17, 2004, William Arthur, Powerhouse's project manager, notified Byers that Powerhouse expected to start disassembly on Monday, October 4. Exhibit 12.

The contract between AMHS and Cascade required that Cascade perform the following pre-disassembly preparation:

> remove all debris, dirt, oil, water and steam clean and organize the engine areas in preparation for engine disassembly. ... All fluid supply lines shall be closed and locked to prevent opening. ... Main engine and engine ancillary equipment shall be steam-cleaned and wiped to remove all dirt, fuel, oil and residual water and detergent.

Exhibits 4, 508, Section 3.6.3.2

In late September Paul LeMoine, Powerhouse's project engineer, met with Kevin Atkinson, field machinist for Cascade, to discuss interferences in the engine room that impeded Powerhouse's disassembly work. LeMoine gave Atkinson a list of the interferences, and said Cascade needed to remove them before Powerhouse could begin the overhaul of the engines. LeMoine also made a request to Atkinson that Cascade construct I-beams over the engines to expedite removal of the heads from the engines.

On September 27, 2004, Arthur sent Byers an e-mail:

> Attached is a listing of interferences that Paul [LeMoine] has created in conjunction with Kevin [Atkinson] from your office that we need removed to provide access to our work on the main engines.

Exhibit 14. The interferences, which obstructed access to parts in the engine room, included jacket water piping, crankcase vacuum fan discharge piping, lube oil sump vent, fly wheel shrouding, inlet

OPINION Page 8

air ducting to turbocharger, jacket water piping to intercoolers, jacket water piping from intercoolers, strainers and piping to check valves at engine headers, pump discharge piping, vibration dampers, vibration damper jack shafts and couplings to crankshaft, grating, and $CO_2$ piping.

Cascade agreed to and did install the I-beams in October 2004. See Exhibit 13. No invoice for the work was provided during this time period. The record indicates that other interferences listed by LeMoine and Atkinson gradually were removed by Cascade, but the evidence does not show when the work was done. The installation of the I-beams and the removal of other interferences was not invoiced to Powerhouse until April 12, 2005, when Byers hand-delivered a spreadsheet to Rick Jones. Exhibit 540.

Some interferences appear to have been removed by Powerhouse, but reinstalled by Cascade, with Powerhouse being charged for the reinstallation. See, e.g., Exhibit 145 (back charge for installation of lube oil and water jacket piping after removal as an interference by Powerhouse).

LeMoine arrived at the vessel in Portland on October 4, 2004. At the time of LeMoine's arrival, the interferences listed by LeMoine had not been removed and the I-beams were not yet in place. Cascade had workers in the engine room, working on the saltwater systems and the lube oil systems, which were in and around the engines. The evidence establishes that with the exception of a two week period in 2005, discussed below, Cascade performed its own

///

OPINION Page 9

work concurrently with Powerhouse in the engine room during the entire time Powerhouse was overhauling the engines.

On October 7, 2004, Byers sent an e-mail to Arthur and to Jim Jones, saying,

> [W]e need to discuss support costs. To date, Cascade has completed steam cleaning of the engines, lube oil analysis, and we are in the process of installing temporary lifting beams above each bank of engine heads. These services are being provided at the request of your on-site foreman.

Exhibit 13.[3] Cascade continued its work in the engine room through October, including taking up deck plating and doing saltwater piping work forward of the engines. The saltwater piping work and the absence of the deck plating made it difficult for Powerhouse workers to get access to the engines, or to stand near or walk around them.

On October 22, 2004, Byers sent Arthur an e-mail, saying,

> [b]ased on your production schedule, disassembly of the engines is to be complete by 10/29/04. We have scheduled main reduction gear work ... to start on 11/1/04. There can be no other work in the general vicinity of the main reduction gears while this work is ongoing. ... Please provide a schedule for your in shop work so that we can schedule AMHS and Cascade General Inspector visits.

On October 26, 2004, Arthur responded with an updated schedule showing disassembly completed on November 12, with post disassembly inspections during the week of November 14. Id.

---

[3] This e-mail is somewhat ambiguous; it suggests that steam cleaning of the engines and lube oil analysis, as well as I-Beam construction, are being done at the request of Powerhouse's foreman, LeMoine, and that Powerhouse will be charged for them, but steam cleaning the engines was Cascade's contractual responsibility. Exhibits 4, 508, Section 3.6.3.2.

OPINION Page 10

On November 5, 2004, Atwood submitted a weekly construction report. Atwood noted that Powerhouse's revised schedule showed disassembly ending on November 12, but that "as of today," Powerhouse had not started on removal of piston liners, main bearing caps, front gear case and cam shafts. Atwood wrote,

> It appears that at the present rate of production that Powerhouse onsite team will be working all the way through December on disassembly and onsite inspection prior to start of reassembly (2 ½ months for disassembly and preliminary inspection vice [sic] the original 4 weeks shown in Powerhouse schedule). In is normal [sic] that reassembly of engine will take 2 to 3 times that was required [sic] for disassembly.

On November 8, 2004, Byers wrote a letter to Jim Jones to express concern about Powerhouse's "lack of progress to date" on the engine overhaul. Exhibit 17. The letter continued,

> As explained during pre-award phone conferences, Cascade General has numerous work items in close proximity to the main engines that we plan on completing during the eight week demobilization period.

Exhibit 17. Byers testified that he was concerned because Powerhouse's revised schedule had cut the demobilization period from the original eight weeks down to four, thereby affecting work in proximity to the engines that Cascade had scheduled during demobilization.

Powerhouse did not staff the engine overhaul at the levels necessary to complete the disassembly on schedule. In part, Powerhouse's understaffing of the project was due to Cascade's conduct in restricting Powerhouse's access to the engines and limiting Powerhouse's work space; under such conditions, adding

///

OPINION Page 11

more people to the engine room would not necessarily have increased Powerhouse's efficiency.

In November 2004, Cascade was still working on piping in the engine room. Cascade had also taken up deck plates; cordoned off some areas of the engine room, making them inaccessible to Powerhouse; restricted clearances, so as to hinder or prevent Powerhouse employees from obtaining access to the engines; installed plastic ducting over parts of the engines; draped air hoses over the engines; and erected staging that blocked Powerhouse's access to the main deck from the engine room.

LeMoine complained on many occasions to Byers, Atkinson and Mike Nutter, a supervisor assigned to the project, about Powerhouse's restricted access to the engines. According to Cascade employee Atkinson, Powerhouse complaints about lack of access to the engine room were "almost an everyday occurrence," that eventually became "a big joke." Tr. 468:20-569:9. According to Atwood's testimony, Cascade's work on shaft bearing and seal overhaul, CPP systems, engine room systems modifications, and main engine exhaust systems modifications[4] were all done at the same time as the main engine overhauls.

On November 11, 2004, Arthur noted Byers' concerns with the project schedule and Powerhouse's low levels of manpower at the site, but said,

> Your contract with the State ... states that "Two mutually exclusive, non-concurrent Work Groups are

---

[4] All tasks identified in the subcontract as Work Group 2 items.

OPINION Page 12

established;" it also states that "The time frame for main engine overhaul and foundation inspections described in Section 3 of these specifications shall be separate and distinct from the Engine Room systems work..." Based on delay reports and daily reports received from our Field Service director Mr. Paul LeMoine, Cascade General has not provided Powerhouse with unencumbered access to the engine room during our disassembly process and has in fact been performing the "Engine Room systems work" concurrently with our "Main Engine Overhaul," which is contrary to the requirements of the specifications.

To date we have documented delays of over ten days specifically related to the lack of unencumbered access to the engines. These delays have cost Powerhouse considerably in both labor and expenses for which we will be submitting a detailed accounting... upon completion of the disassembly phase.

Exhibit 20. Arthur complained in the same e-mail about Cascade's late payment of Powerhouse's first invoice. Id. On November 16, 2004, Arthur reiterated his complaints to Byers about Powerhouse's lack of unencumbered access to the engine during disassembly because of the concurrent work being done by Cascade. Exhibit 524.

At the end of November 2004, Powerhouse requested additional time to obtain parts and do extra work. The deadline for engine commissioning was extended to March 15, 2005, with a vessel sailing date of April 15, 2005.

Powerhouse's inspections after disassembly resulted in purchase requests in December 2004, January 2005, and February 2005, for additional material and labor, including 16 connecting rods, to be replaced for $296,000; block milling, which increased labor cost by $160,000; four intercoolers, to be replaced at a cost of $32,000 each; piston assemblies, which added $313,600 in materials costs; repair of one rocker arm and shaft, for an additional $7,380 in labor and materials; replacement of exhaust

manifolds, for an additional labor cost of $164,000; replacement of sub covers, for an additional cost of $108,800; repair of crankcase doors and cam door threaded holes on the engine block, for an additional cost of $13,050; additional turbocharger parts, beyond those specified in the contract, for an additional $19,648 in materials; upgraded fuel tappets, for an additional $52,800 in materials cost; replacement of six intermediate push rods and 20 intake exhaust push rods, at a cost of approximately $16,000; replacement of fuel pump pin and deflectors, at an increased material cost of $15,360; fuel pump base modification, for an increased labor cost of $4,000; and overhaul of vibration dampers, which increased labor and materials costs by $46,848. Exhibit 7. AMHS agreed to change orders for this work.

The original subcontract amount with Powerhouse was approximately $1.4 million. The change orders added approximately another $1.2 million to Powerhouse's contract. The cost of the change orders and the terms under which the work was to be done was settled between Cascade and AMHS; the need for the change orders was not disputed.

The work plan for the engines required that after disassembly, Powerhouse would clean the engines and prepare them for reassembly; inspect the engine blocks and the materials and parts that were left on the vessel; and recondition in its shop the so-called Part B items that had been removed from the vessel.

Byers asked AMHS for a one week extension of the contract, to which AMHS agreed. As a result of this extension, the schedule was

OPINION Page 14

modified on December 2, 2004, to show reassembly beginning in mid-December and completed by March 8, with testing in the following weeks. Exhibit 539.

On December 3, 2004, Byers sent an e-mail to Arthur, accepting Powerhouse's proposal that the reassembly schedule be moved out to incorporate change work, the two to three weeks necessary for block machining, and the Christmas holidays. Exhibit 23. Arthur had proposed that the block machining be scheduled for a time after Cascade had completed piping and structural work between and around the main engines. Id. Byers agreed to provide a purchase order and down payment for connecting rods and block machining by December 10, 2004, followed by a purchase order and down payment for all other new work recommended in Powerhouse's inspection report dated November 29, 2004, by December 17, 2004, in return for Powerhouse's completing reassembly of the main engines and having them ready for testing on or before March 8, 2005. Exhibit 525.

In January 2005, Cascade set up a plastic barriers as a containment area around the engines to prevent contamination from welding and grinding, to provide ventilation so that engine assembly and pipe fitting work could happen simultaneously, and to separate Cascade and Powerhouse work crews from each other. The plastic barriers created additional difficulty with access to the engines. Powerhouse complained to AMHS's Atwood about crowding in the engine room and possible contamination from airborne material generated by Cascade's pipe fitting activity. Atwood referred Powerhouse to Cascade.

OPINION Page 15

On January 24, 2006, after a meeting with Cascade, Powerhouse provided another updated schedule, which showed 14 people on site for reassembly. At a "50% meeting" in January, Jim Jones met with Cascade, AMHS, and other subcontractors, to discuss the fact that Powerhouse was behind schedule. Jones complained that it was impossible to hold the schedule because Powerhouse had never been given the work environment it needed. According to Jones, at about the time of the 50% meeting, the block machining was ongoing, the gratings were pulled up, piping and people were everywhere, and it was "chaotic and a disorderly mess." Tr. 1144:7.

On January 25, 2005, Byers sent an e-mail to Arthur, requesting that he confirm the shift schedule and work hours per day on which the January 24 schedule revision was based, and that he also confirm that there were no delivery problems. Exhibit 528. Arthur responded that the shift schedule for both crews was 12 hours a day, seven days a week, involving two crews of six, each with a lead mechanic and with LeMoine overseeing the reassembly for both engines. Id. Arthur confirmed that no material delivery problems were anticipated. Id. However, Powerhouse was already behind on main engine block cleaning. Scheduled to be finished by January 27, 2005, the work was not begun until January 28, 2005.

On January 31, 2005, Dave Whitcomb, a project manager for Cascade assigned to the project for four to five weeks in January and February, sent an e-mail to Byers saying, "Based on the schedule that you gave me, it appears that we may be slipping behind on reassembly. There are additional people today, but it

OPINION Page 16

does not look like they [Powerhouse] were ready for the additional personnel and do not have the work lined out for them. ... It appears to me that the schedule was not communicated to the people here." Exhibit 28.

The rebuilding of the engines was further hindered by LeMoine's absence from the vessel for the period between January 23, 2005 and February 6, 2005. Powerhouse fell behind its published schedule in starting installation of the engines.

On February 1, 2005, Cascade pulled all of its personnel out of the engine room for two weeks. Exhibit 31. Except for this two week period, Cascade crews had worked in the engine room concurrently with Powerhouse, and on at least two occasions in November 2004, Cascade had ordered Powerhouse to be "out of the way" while it did its engine work. Despite the absence of Cascade personnel on February 1, 2005, Whitcomb noted in his journal that Powerhouse crews worked only an eight hour shift that day, and LeMoine was not there. Exhibit 31. Engine reassembly was not started. Id.

On February 1, 2005, Byers sent an e-mail to Arthur, noting that essential parts, including connecting rods and liner inserts, and key personnel, including project engineer LeMoine and a second lead mechanic, were not onsite. Exhibit 13. Byers wrote that Powerhouse's ability to complete reassembly by March 8, 2005 was a major concern, particularly since the connecting rods and piston assemblies, being manufactured in Denmark, had not yet left the manufacturer's facility even though they needed to be onsite by

OPINION Page 17

February 6, 2005, to support Powerhouse's schedule. Id. Byers noted further that the castings for the first set of the new sub covers had been rejected, although they had to be onsite by February 20, 2005 to support Powerhouse's schedule. Id.

Jim Jones acknowledged in his testimony that the third party to which Powerhouse had subcontracted the machining of the liner inserts took three weeks to do the job instead of the anticipated 10 days. Jones testified that the engine could not be reassembled until the machining was done and the liner inserts put into the engine blocks. While the concurrent engine room work created problems for timely completion of the work, Powerhouse had other issues like these, which were independent of the concurrent work and resulted in Powerhouse missing its deadlines.

On February 2, 2005, Whitcomb observed that although Cascade was out of the engine room, Powerhouse worked only an eight hour shift. Exhibit 31. No engine reassembly had started because the engines were not clean. Id. On February 3, 2005, Whitcomb recorded in his log that Cascade still was not working in the engine room, but Powerhouse personnel did not arrive until after noon. Id. During that afternoon, Powerhouse continued cleaning the engines, but no work was accomplished on reassembly. Id. On February 4, 2005, Whitcomb recorded that Cascade remained out of the engine room and Powerhouse performed final vacuuming on the starboard main engine and made preparations to lift the forward main bearing. Id. Whitcomb testified that installation of the bearings was the first task required in reassembling the engines.

On February 6, 2005, Whitcomb wrote that Powerhouse continued to work on the engine bearings; at this point Powerhouse was approximately a week behind on main bearing installation, which was to have been done by January 31, 2005. Exhibit 31. LeMoine had not been onsite for technical guidance during installation of the bearings. Id.

Whitcomb testified that the schedule called for Powerhouse to install the liner inserts between February 2 and February 4, 2005. As of February 5, 2005, only nine of 32 liner inserts were onsite, and none had been installed. Atwood testified that in his opinion, Powerhouse's lack of qualified engine overhaul personnel on site was a major problem with the engine overhaul.

In February 2005, Cascade requested and received contract extensions from AMHS that moved the vessel's departure date from the shipyard to April 28, 2005. AMHS did not assess penalties or costs against Cascade for any of the extensions, and did not impose liquidated damages on Cascade for the delays. All of the extensions granted by AMHS added five weeks to what had originally been bid as a seven month job.

Cascade returned its personnel to the engine room on or about February 23, 2005. Despite the plastic barriers, Powerhouse continued to express concerns about Cascade's grinding and welding contaminating its work site.

Byers hired a consultant, Mike Hartwig of Advanced Engine Technology Corporation (AETC), and asked him to visit the job site, give his assessment of progress on the engine overhaul, and provide

OPINION Page 19

a plan for completing the work in the form of a schedule and manpower plan. AETC recommended a schedule and manning plan that were essentially the same as Powerhouse's schedule and manning plan of January 24, 2005, Exhibit 36, but Powerhouse never met its manning schedule.

On March 1, 2005, Powerhouse notified Cascade that its supplier was unable to meet the delivery date for the intercoolers, so that they would not be on the job site until the end of April. According to the testimony of D'Isabella Lee, Powerhouse vice-president, Powerhouse had already received a down payment on the intercoolers of approximately $25,000. Byers cancelled Powerhouse's purchase order for the intercoolers and ordered them directly from Thermal Engineering, the same vendor Powerhouse had been using. Cascade and Powerhouse agreed that Powerhouse could have the profit it would have realized from the sale of the intercoolers if Powerhouse completed main engine reassembly on schedule. Exhibit 176. That schedule was not met. The intercooler delivery issue is another example of a failure to perform by Powerhouse that was not related to concurrent engine room work. However, the failure to meet the reassembly schedule was in part a result of the concurrent work.

On March 3, 2005, Arthur sent an e-mail to Byers requesting a contract extension. Exhibit 32. On March 9, 2005, AMHS granted another extension, and the date for the vessel's delivery was moved out to April 28, 2005.

On March 3, 2005, and again on March 10, 2005, Byers

OPINION Page 20

complained to Powerhouse that it was not allocating sufficient manpower to support the contract milestones. Exhibits 33, 34. Byers demanded that Powerhouse increase its allocation of resources to reflect the manning levels outlined in the current production schedule, no later than March 12, 2005; if Powerhouse failed to do so, Cascade would supply marine mechanics and riggers who would work under Powerhouse's project engineer. Exhibit 34. During reassembly, Powerhouse did increase its man hours to the 80-100 hours per day range, even though Cascade continued to work in the engine room doing pipe work, welding, grinding, and cutting.

On March 5, 2005, Whitcomb visited Powerhouse's shop in Benicia, California, to evaluate Powerhouse's refurbishment efforts. The schedule called for installation of the cylinder heads on both engines by February 21; on March 5, 2005, Whitcomb observed that 16 of them were still onsite at Benicia. Whitcomb learned from Arthur that the vibration dampers were still in a machine shop in the Bay Area. Although the turbochargers were scheduled to be installed by March 2, 2005, as of March 4, 2005, they were "in pieces" in Powerhouse's shop in Benicia. Whitcomb observed that of the 16 fuel pumps per engine, only five were assembled.

On April 4, 2005, Jim Jones wrote a letter to Byers in which he acknowledged Powerhouse's responsibility for having the engines assembled and ready to start on April 14, 2005, but which also drew Byers' attention to the contractual provision of two mutually exclusive, non-concurrent work groups. Exhibit 38. Jones also wrote:

OPINION Page 21

We acknowledge that Cascade has provided outstanding support for the coordination of the work within the engine room. Regardless, no amount of coordination can lessen the impact to our work flow caused by missing deck plates, barriers and curtains, welding and grinding activities, and all the other associated encumbrances realized when two companies attempt to perform so many activities in such a confined area.

Id.

Atwood has testified that during April 2005, Cascade and Powerhouse were both trying to work in the engine room, and that crowding made production low. On April 18, 2005, Mark Perez, a federal inspector reporting to Atwood, observed that there were too many people in the engine room and not enough supervision of the engine room by Cascade; Perez testified that his concern was safety.

Atwood testified that toward the end of the job, the engine room was "at a massive panic overload," Tr. 639:1 and "astronomically crowded." Tr. 639:4. Atwood explained that at the time, numerous vendors and subcontractors were working in the same space at the same time. He estimated that at least 20 people were working in the engine room.

Lance Block, a self-employed mechanical engineer who provided services to Powerhouse and assisted with final assembly of the engines, testified that he went into the engine room in April 2005 and was "rather shocked" by the conditions he found. Tr. 995:11-14. Block testified that the "most distressing" thing was that when he walked into the engine room, there were fluids coming down from overhead, "just running all over my shoulders." Tr. 995:21-23.

OPINION Page 22

These fluids were from Cascade's steam cleaning work somewhere overhead. Block said that normally, when engine systems are open, attempts are made to keep foreign material out of the systems.

Block also observed that parts were not staged directly in the work area that was allocated to Powerhouse; instead they were scattered throughout the car deck.

On April 17, 2005, Byers sent an e-mail to Jim Jones. Exhibit 82. The e-mail stated that Cascade would "continue to provide labor and material assistance, as requested, to support completion of the Main Engine work." Id. Attached to the e-mail was a spreadsheet showing charges for support Cascade had provided to Powerhouse through April 14, 2005. Id. Byers made a note on the spreadsheet that he had handed it to Rick Jones, vice president of Powerhouse, on April 12, 2005. Total back charges at that time were $149,982. Exhibits 540, 81.[5]

Although Powerhouse had incurred back charges since October 2004, Cascade had not invoiced Powerhouse for these charges or otherwise notified Powerhouse of what charges had been incurred, until Byers provided the April 2005 spreadsheet. LeMoine testified that he had no understanding of how Cascade was charging for removal of interferences and assistance, and that although LeMoine asked Cascade how he was supposed to keep track of the service charges, he was never shown any invoices for the work. LeMoine

---

[5] The parties use the terms "support charges," "support and assist charges," and "back charges" interchangeably to indicate charges incurred by Powerhouse for work performed by Cascade on Powerhouse's behalf. The court refers to these charges as back charges.

OPINION Page 23

testified that Byers told him he was tracking the hours, but LeMoine never saw any accounting of the charges.

Jim Jones, Rick Jones's brother and the president of Powerhouse, responded to the spreadsheet as follows:

> It has been agreed that there will be no back charges or liquidated damages accrued against Powerhouse by Cascade due to the enormous amount of ongoing concurrent work. The April 14 start-up date deadline for both engines has been waived by Cascade due to this concurrent work effort, and Powerhouse as well as Cascade are working together day to day on assuring the vessel leaves the yard by the 25th, or the latest the 26th of April, for delivery to Bellingham on the 28th of April.

Exhibit 540. In his response to this e-mail, Byers did not take issue with Jones's assertion that there would be no back charges; Byers said only that liquidated damages would be assessed if the vessel were not delivered to AMHS by April 28, 2005. Id.

Jim Jones testified that he believed Cascade had agreed that there would be no back charges based on the statement by Byers that, if the ship left on time, "all this goes away." Tr. 1151:15-17. But at the end of April, Byers suddenly stopped approving Powerhouse's invoices. Byers' stated reasons to Jim Jones were that Cascade still did not know whether AMHS would impose liquidated damages and because Powerhouse owed Cascade money for the back charges. Jones testified that Byers did not tell him that Powerhouse owed Cascade more in back charges than Cascade owed Powerhouse on its invoices.

Until late April, Cascade had been paying Powerhouse's invoices, withholding five percent against warranty work. At trial, Byers's testimony was that Cascade stopped paying Powerhouse's

OPINION Page 24

invoices for two reasons: first, because Cascade concluded that the work represented on Powerhouse's invoices was not complete, and second because by late April, Cascade's back charges exceeded the amount due on Powerhouse's invoices. This explanation conflicts with Byers's explanation to Jim Jones for not paying Powerhouse's invoices, and with Byers's tacit acceptance of Jim Jones's e-mail stating his understanding that the back charges would "go away" if the vessel left on time.

At trial, Byers was unable to specify any work invoiced by Powerhouse that was not completed. He confirmed that Cascade did not pay an invoice dated March 28, 2005, in the amount of $14,400 for eight fuel injection pumps, even though the eight pumps were shipped, delivered and installed in the engine. Byers confirmed that Cascade did not pay another invoice, also dated March 28, 2005, for viscous dampers, even though the dampers were delivered to the vessel and installed. Id. Byers confirmed that Cascade did not pay a third invoice, also dated March 28, 2005, in the amount of $61,500, for exhaust manifold assemblies, even though they, too, were delivered and installed on the vessel. Id. Byers acknowledged that all the parts on the unpaid invoices were actually delivered and installed.

The court finds Byers's testimony that Cascade's failure to pay Powerhouse's invoices after the end of April 2005 was because the work represented on the invoices was incomplete not credible.

On April 25, 2005, three days before the vessel was scheduled to leave the shipyard, and during initial engine testing, the

OPINION Page 25

starboard main engine (SME) was run for two to three minutes. The SME's lube oil pump (LOP) overheated. The engine was shut down and the LOP was removed and sent to Cascade's machine shop for inspection and repair. Cascade's machinists concluded that the bearing clearances were too tight and corrected them.

When the SME LOP was reinstalled, it overheated again. The SME was shut down again and the LOP removed. The suspected cause was lack of lubrication. According to Jim Jones, Powerhouse's opinion was that a check valve which had been installed on the discharge side of the LOP at the request of AMHS was prohibiting oil flow. Cascade removed the check valve; afterwards, the pump ran within normal temperatures. I conclude that these check valves required by AMHS were the cause of the LOP overheating issues.

When the port main engine (PME) was tested, it made an uncharacteristic noise. The PME LOP was removed and sent to Cascade's machine shop. When the LOP was taken apart, it appeared to have been run dry; the inside of the pump was free of oil. After the same check valve was removed from the PME LOP, the noise stopped. The PME LOP did not overheat.

On April 27, 2005, Jim Jones sent an e-mail to Byers:

> Powerhouse strongly recommends that the Lube Oil Pumps on both engines be removed and inspected and/or repaired as necessary, prior to the departure of the vessel for Sea Trials or conducting load tests at the dock. The recent check valve modification to the L.O. discharge piping has caused one outright failure and one serious overheating of the SME pump and the PME pump was emitting loud rattling noises which were not at all typical for this series of pump. We are not condemning either pump outright but can in no way guarantee performance nor warranty failures of any nature during the sea trials or the normal operating season without removal and

OPINION Page 26

> inspection/repairs as noted above. ... Any costs associated with the removal, repair, transportation, installation of the M/E LOPs are not the responsibility of Powerhouse. ...

Cascade forwarded this e-mail to Atwood, but because of time constraints, Atwood decided on behalf of AMHS to run the pumps as they were.

Cascade continued to work on the vessel through April 28, 2005, the day the ship was scheduled to sail, including working on the sprinkler system and the fuel oil system. Meanwhile, on April 27, 2005, Byers sent an e-mail to Jim and Rick Jones saying that during regular maintenance checks in the engine room, the ship's crew had found metal shavings in the LOP suction strainers. Exhibit 83. Byers testified that the contamination was cleaned up on April 29 or 30, 2005.

The vessel did not depart the shipyard until April 30, 2005. Because of the rushed schedule, and on AMHS's orders, the vessel's engines were not put through a full test before departing from the shipyard. During sea trials, the vessel developed problems with the air start valves and valve thrusters. The vessel put in at Astoria. Powerhouse retorqued all of the air start valves and replaced some of them. Powerhouse crews on board the vessel repaired items on a punch list of warranty items that the ship's crew had prepared.

On May 2, while the vessel was underway to Bellingham, Washington, the SME lost lube oil pressure. The problem was not reported by the crew. Instead, the crew continued to run the engine until it shut down. The vessel continued to Bellingham using the electric drive LOP.

The vessel remained in Bellingham until May 7, 2005, after two or three attempts at a sea trial. In Bellingham, the SME LOP was removed and it was discovered that the shaft was sheared off and the gear train was misaligned. On May 4, 2005, Arthur wrote to Byers with a recommendation that, because it would otherwise be impossible to determine the internal damage caused by the sheared shaft, the gear case cover needed to be removed, an inspection made of all "gears, backlash, bushings, oil supply lines, etc.," the gaskets and seals disturbed by the inspection be replaced, the gear case cover be replaced, and a new LOP be installed. Exhibit 547.

Jim Jones testified that this would have been a four to five day job. But by this time, ticketed passengers were waiting for the vessel. AMHS decided not to follow Powerhouse's recommendation. Mike Hartwig, who was at that time working on the vessel as a technical consultant, had opined that the gears would probably get the vessel through the run season.

On May 5, 2005, Arthur sent an e-mail to Atwood stating that Powerhouse would not accept any responsibility for any damages or loss of operational integrity due to the failure to follow its recommended procedures. Exhibit 548.

Byers had asked Powerhouse to provide a replacement SME LOP. Powerhouse refused to provide a new pump at its own expense because Cascade had not paid its outstanding invoices, and because AMHS had gone against Powerhouse's recommendations. Eventually the State of Alaska gave Powerhouse a purchase order for a replacement pump. Powerhouse provided the pump and flew it to Bellingham. The new

OPINION Page 28

pump arrived in Bellingham on May 5, 2005.

Cascade modified the adapter plate on the gear case of the SME LOP without removing the gear case, as an alternative to Powerhouse's recommendation, and installed the SME LOP in the early morning hours of May 6, 2005. A sea trial was attempted, but lube oil pressure was found to be low. Eventually this problem was traced to a broken lube oil main bearing tube.

The vessel departed Bellingham for Alaska, arriving in Ketchikan on May 9, 2005.

On May 18, 2005, AMHS sent a letter to Byers notifying Cascade that the work performed on the M/V Columbia had been determined to be defective and enclosing a list of known deficiencies as of that date. Exhibit 809. From this list, the letter noted that there were "two critical items on this list that require prompt action to correct," a jacket water leak in the PME inboard exhaust manifold, and a broken SME supply fuel oil regulator valve. Id.

Byers testified that the new exhaust manifolds had been provided by Powerhouse, and that they had developed an internal leak; in his opinion, Powerhouse was contractually required to fix that problem. According to Byers, Powerhouse sent a worker to the site, but the worker was not prepared to complete the repair because he did not have tools and materials. Byers testified that Cascade did the repair, with Powerhouse providing a schematic of the exhaust manifolds.

Byers testified that the broken SME supply fuel oil regulator valve was also an item that had been subcontracted to Powerhouse;

OPINION Page 29

Byers did not recall whether Powerhouse fixed that problem.

On May 20, 2005, Diehl Engineering was brought on board the vessel as a consultant to inspect the gears on both engines. According to Diehl's report, the SME LOP drive gear showed pitting and wear not expected after 100 hours of operation. On September 23, 2005, Jim Jones confirmed that, although the subcontract called for a new gear, the gear was not new; rather, it was an old gear that had been reconditioned by Powerhouse. Powerhouse did not invoice Cascade for the reconditioned gear. In October 2005, Cascade purchased a new drive gear from Cooper Compression for $21,316, and installed it under the direction of AETC.

On May 25, 2005, AMHS issued a notification of deficient workmanship to Cascade, stating that the SME LOP drive and gears had been "determined to be defective and must be replaced," due to serious angular misalignment and deterioration of gear teeth. AMHS also notified Cascade that the LOP adapter plate that Cascade had modified, in order to allow the LOP to operate with misaligned drive gears, would have to be replaced. Exhibit 91. This modification appears to have been done to get the drive gear aligned. It is unclear whether the modification was necessitated by Powerhouse's use of a reconditioned, rather than new, drive gear.

In May, June and July 2005, Byers, Arthur and Jim and Rick Jones had a series of conversations and meetings to discuss the back charges. On May 20, 2005, Cascade provided Powerhouse with a revised spreadsheet showing back charges. Exhibit 39. The May 20 spreadsheet showed back charges in the amount of $398,183. At that

time, Powerhouse's outstanding unpaid invoices to Cascade totaled $336,404. Jim Jones testified that he objected to many of the back charges, and provided the details of some of his objections to the charges on Exhibit 566. The parties were unable to reach an agreement on the back charges.

On July 25, 2005, Atwood sent an e-mail to Byers, reporting several ongoing problems, including 1) a leak in the PME inboard exhaust manifold; 2) a broken main engine exhaust valve spring; 3) leaking rocker assembly shafts; and 4) misalignment of the rocker shaft dowels. Exhibit 104.

Although Powerhouse undertook to replace all 128 of the valve springs, it only provided 64. Powerhouse witnesses testified that the reason only half of the valve springs were sent was that the new valve springs were sent on condition that Cascade return the old springs so Powerhouse could determine whether it had a claim for them against its vendor. Because Powerhouse did not receive the old valve springs from Cascade, and because Powerhouse was in a dispute with Cascade about the back charges, Powerhouse did not ship the second 64 valve springs and did not invoice Cascade for them. Eventually, Powerhouse sent the valve springs directly to AMHS. Powerhouse re-machined the rocker arms.

On June 28, 2005, Powerhouse notified Cascade that no warranty items or replacements for borrowed items would be provided until all financial issues were resolved to the satisfaction of Cascade and Powerhouse. Exhibit 181. Jones added that the "anticipated completion of this task" was July 8, 2005. Id. In response, Atwood

sent an e-mail to Byers stating that the delay in addressing main engine warranty items or replacement for borrowed items until after July 8, 2005 was "unacceptable." Id.

On September 21, 2005, AMHS sent another letter notifying Cascade that the SME LOP pump drive and gears had been determined to be defective and "must be replaced." Exhibit 118. Byers testified that he forwarded the letter to Powerhouse for action.

On September 30, 2005, Arthur sent an e-mail to Byers, saying that Powerhouse had determined that it would not accept responsibility for the repair of the damaged LOP and its drive components because of the "failure to follow our recommendations during [the vessel's] initial operation and subsequent failure in April..." Exhibit 123. Arthur wrote that after the two overheating events, Powerhouse had notified Cascade and AMHS in writing on April 27, May 4, and May 5, 2005, that the pumps should be removed, inspected and repaired prior to the departure of the vessel for sea trials; that Powerhouse crews were standing by on the vessel to perform this work; and that the costs of the repair would be forwarded to Cascade. Id. Arthur stated that the State of Alaska "chose schedule over safety and made the decision to run the vessel," without removing and inspecting the pumps. Id.

On October 10, 2005, Byers inquired about whether Powerhouse would finish incomplete work items, as opposed to warranty work. Exhibit 124. Jim Jones responded that Powerhouse would not honor warranties on items that Cascade repaired and installed, or on "anything that the State of Alaska arbitrarily operated after ...

OPINION Page 32

warnings from Powerhouse not to do so." Id. Jones stated that the only warranty outstanding was the valve springs, which Powerhouse had shipped to AMHS at no charge the previous week. Id. Jones challenged the accuracy of the task list, stating that many of the items had already been completed, while others were not Powerhouse responsibilities. Id.

On October 11, 2005, Byers asked Arthur and Jones to provide an action plan for completing each outstanding work item on the list; otherwise, Cascade would take action to complete the work and back charge Powerhouse for all associated costs. Arthur responded that no further work would be performed by Powerhouse, and no parts or components would be supplied, "until the ongoing legal proceedings have been completed." Id.

On October 14, 2005, Byers sent an e-mail to Arthur and Jim Jones:

> You have refused to complete warranty work on the M/V Columbia to replace defective materials, to correct deficient workmanship and to complete work tasks in accordance with our contract. As a result, Cascade General is taking action to complete a portion of your outstanding warranty items. The work will be completed next week and will include the replacement of the defective Main Engine cylinder head valve springs and work to correct deficiencies associated with the Main Engine control air tubing. Other outstanding Powerhouse work form the AMHS "Punch List" dated July 14, 2005 may also be completed as time allows. Our estimated costs for completing this portion of Powerhouse's outstanding work is $43,285. This estimate does not include the cost of new valve springs or AMHS costs, if any. The actual cost of the work will be forwarded for your information as soon as possible after the work is complete. We have set up an account to collect costs for this project. All costs associated with this work will be billed to Powerhouse Diesel Services. ...

OPINION Page 33

Exhibit 127.

On January 19, 2007, AMHS provided Cascade with a punch list of items for the main engines that were still not completed. Exhibit 185. The items, which Cascade contends were the contractual responsibility of Powerhouse, included priming and painting the engines, return of main engine parts borrowed from the ship, inspection and overhaul data for both engines, and ABS certifications for main engine components. Id.

The state of Alaska has withheld $249,639.09 from Cascade for work on the vessel that remains undone, but has not imposed liquidated damages or other penalties on Cascade. The contract between AMHS and Cascade has not been closed.

## Conclusions of Law

The parties agree that the law applicable to this case is the law of Oregon.

Cascade has alleged two claims: 1) breach of contract for Powerhouse's failure to complete the contracted-for work on a timely basis, provision and installation of defective parts, failure to provide warranty work, and failure to perform work to the standards of good ship building practice; and 2) breach of the implied warranties of professional work and fitness for use.

Powerhouse has alleged five counterclaims: 1) breach of contract for unpaid invoices; 2) breach of contract for encumbered work space; 3) recovery in quantum meruit for the reasonable value of work performed before April 28, 2005; 4) recovery in quantum meruit for the reasonable value of work performed after April 28,

OPINION Page 34

2005; and 5) declaratory relief that Powerhouse is not obligated to Cascade for the amount of back charges Cascade claims.

A breach of contract claim requires 1) a valid contract containing the terms claimed to be breached; 2) that the plaintiff performed its obligations under the contract; 3) that the defendant did not perform its obligations under the contract; and 4) that plaintiff was damaged by the claimed breach. See, e.g., <u>Northwest Natural Gas Co. v. Chase Gardens, Inc.</u>, 333 Or. 304, 312 n. 3 (2002).

Cascade asserts that its nonpayment of Powerhouse's outstanding invoices was not a material breach of the subcontract because the unpaid invoices amount to less than 15% of the $2.6 million subcontract, and because Powerhouse concedes that it owes Cascade some amount for back charges, though it disputes the total.

Whether a breach is material is a question of fact if the facts are disputed. <u>DeVol v. Citizens' Bank</u>, 113 Or. 595, 602 (1925). The court concludes that Cascade's failure to pay Powerhouse's outstanding invoices after April 2005 was a material breach. The court also concludes that Powerhouse's failure to complete the contracted-for work on a timely basis and according to the contract terms, was a material breach. The evidence shows both Cascade and Powerhouse were responsible for delays and for each party's difficulty in accessing the engine room. Powerhouse also had problems with inadequate manning levels and late deliveries of parts. Cascade was certainly one major cause of these problems with its insistence on performing concurrent work in the engine room

OPINION Page 35

during for all but two weeks of the time Powerhouse was disassembling and assembling the engines. Powerhouse was another significant cause of these conditions by not providing adequate resources to complete its disassembly and reassembly work in a timely fashion, failing to meet its own schedules, and not providing crucial parts on time. Powerhouse's response to Cascade's concurrent work in the engine room consisted primarily of ineffectual complaints while simultaneously making unfulfilled promises to complete the work on time. Further, the evidence shows that Powerhouse and Cascade received extensions of the scheduled dates for their performance from AMHS.

While both Cascade and Powerhouse were in breach, they each elected to continue to perform the contract, however ineffectual their performance was.

### Cascade's claimed contract damages

Cascade claims the following damages.

1. $580,066 in back charges. This amount represents the amount stated on the May 20 spreadsheet, $398,183, plus additional charges.

2. $113,300 for work left unfinished by Powerhouse and finished by Cascade, including ABS documentation, the cost of a sea trial, and parts borrowed from the vessel's parts supply.

3. $21,315 for the new SME LOP drive gear purchased by Cascade from Cooper Industries.

4. $117,500 as "future and unassigned" costs, including

possible liquidated damages and costs associated with contract extensions granted by AMHS.

5. $358,132 in "impact damages."

6. $29,942, representing the amount owed to one of Powerhouse's subcontractors, Vanport

### Powerhouse's claimed contract damages

Powerhouse claims the following damages:

1. $336,404 in unpaid invoices.

2. $35,000 in lost profits on the intercoolers (an estimated profit of $60,000 less the approximately $25,000 prepaid).

3. $5,990 for unreturned valve springs.

4. $426,904.03 as "impact damages."

5. $81,123, the retainage withheld from its invoices by Cascade

6. $44,412, on a quantum meruit basis, for services rendered to Cascade after April 28, 2004.

### Damages awarded to each party

Based on my review of the evidence, part of which is summarized above, I find that Cascade has sustained its burden of proof on its damages claims as follows:

$137,693.00 in back charges.

$21,315.00 for replacement of the SME LOP drive gear.

$25,000.00 for prepayment on intercoolers.

I therefore award to Cascade as breach of contract damages the sum of $184,008.00.

OPINION Page 37

I find that Powerhouse has carried its burden of proof on its damage claim for $336,404.00 in unpaid invoices. I therefore award to Powerhouse as breach of contract damages the sum of $336,404.00.

Accordingly, Powerhouse is entitled to a net verdict in the amount of $152,396.00.

Neither party is entitled to its claimed "impact damages." Such damages are precluded by the language of the change orders. The change orders provide:

> This Change Order constitutes a full and final settlement for all costs (including, but not limited to, all direct, indirect, delay impact and ripple-effect costs of labor, subcontractors, materials, and equipment; as well as all taxes, insurance, bonds and profits) and time which are in any way associated with or resulting from [work for which the extension is granted].

Powerhouse seeks as damages the retainage withheld from its invoices by Cascade, in the amount of $81,123. The contract between Cascade and AMHS has not closed, in part because of Powerhouse's failure to complete its warranty work and replace defective parts. Because AMHS has not yet released the retainage, Powerhouse is not currently entitled to recover the retainage as damages.

Powerhouse is not entitled to declaratory relief that the back charges are not owed to Cascade. The ruling on the back charges owed to Cascade precludes such relief.

In reaching these awards of contract damages, I have considered carefully all the evidence, including the testimony and the exhibits. In many particulars the evidence was conflicting, requiring me to resolve the conflict. I used the traditional methods for resolving conflicts in testimony and for determining

the credibility of the various witnesses and their testimony. In some instances there were questions that lingered about a witness's personal knowledge to support the testimony. In other instances, there were bold conclusions made by witnesses without any clue being offered of the basis for the conclusion. In other instances, there was testimony about "estimates" of an item of damage, again without any insight being offered into the basis for that estimate by which to judge its reasonableness. In all these situations, as the finder of the facts, I have been required to determine which party had the burden of proof, and after resolving these issues, whether that burden had been sustained. Consistent with the jury's instructions in a jury trial, if I could not tell on which side the evidence weighed heavier, I resolved that issue against the party who had the burden of proof.

## Attorney fees

Under Or. Rev. Stat. § 20.096(5), the prevailing party in an action on a contract is the party in whose favor final judgment is rendered. When there are claims and counterclaims on the same contract, and both parties are awarded affirmative relief in the form of damages, the court nets the damage awards in determining the party in whose favor final judgment is rendered. Wilkes v. Zurlinden, 328 Or. 626, 632 (1999). Powerhouse is therefore entitled to recover its attorney's fees from Cascade.

The court has previously ordered that Cascade is entitled to attorney's fees for trial preparation preceding the postponement of the trial, to the extent that such trial preparation was

duplicated, in preparation for the new trial date. Cascade is ordered to submit its documentation of these duplicated fees in accordance with the court's Local Rules. They will be deducted from Powerhouse's judgment.

Dated this 9th day of November, 2007.

_____

Dennis James Hubel
United States Magistrate Judge

OPINION Page 40