1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF OREGON

9

10   CASCADE GENERAL, INC.,          )
                                     )      No.  05-1334-HU
11              Plaintiff,           )
                                     )
12      v.                           )
                                     )      OPINION AND ORDER
13                                   )
                                     )
14   POWERHOUSE DIESEL SERVICES,     )
     INC.,                           )
15                                   )
                Defendant.           )
16  _____)

17   Jill Schneider
     Schwabe, Williamson & Wyatt
18   1211 S.W. Fifth Avenue, Suite 1900
     Portland, Oregon 97204
19        Attorney for plaintiff

20   Robert L. Aldisert
     Cody M. Weston
21   Perkins Coie
     1120 N.W. Couch Street, Tenth Floor
22   Portland, Oregon 97209
          Attorneys for defendant
23

24   HUBEL, Magistrate Judge:

25        Plaintiff Cascade General, Inc. (Cascade) moves the court to

26   amend the findings and conclusions entered after court trial on

27

28   OPINION AND ORDER Page 1

1  November 9, 2007. Cascade asserts that the court erred in two
2  respects: first, by awarding defendant Powerhouse Diesel Services,
3  Inc. (Powerhouse) $336,404 as damages for unpaid invoices, without
4  subtracting from that amount $81,123 withheld as retainage; and
5  second, by awarding Cascade damages for the purchase of a new drive
6  gear without also awarding Cascade its labor costs, travel and per
7  diem costs for Cascade's employees to effect the replacement, and
8  consulting charges. Having reexamined these issues at length, I
9  deny the motion.

10      1.  Retainage

11      Cascade asserts that the $336,404 in unpaid invoices claimed
12  by Powerhouse and awarded as damages by the court includes $81,123
13  in retainage, so that the damage award should be reduced to
14  $255,281.

15      The parties have not directed the court to any written
16  contractual language governing retainage. The court has reviewed
17  the testimony of the witnesses and Exhibits 3, 4, 507 and 508 for
18  the terms of any agreement between the parties about retainage.

19      Cascade witness David Byers testified that, after the contract
20  award, Cascade and Powerhouse agreed that Cascade would withhold
21  five percent from Cascade's invoices for warranty retention. Tr.
22  59. Byers testified that the five percent withholding was not done
23  in all cases, but was only a "general practice." Tr. 293-94.
24  Powerhouse witness Bill Arthur testified that he understood
25  retainage to be withheld for performance. Tr. 591. Arthur denied
26  that the retainage was withheld for warranty work.

27

28  OPINION AND ORDER Page 2

1    Even assuming that the Cascade and Powerhouse agreed that
2  Cascade would withhold five percent from Powerhouse's invoices for
3  warranty work, Cascade has not proven that $81,123 represents the
4  amount retained, pursuant to this agreement, from the unpaid
5  invoices in the amount of $336,404.

6    According to Exhibit 96, Cascade was, as of June 10, 2005,
7  currently holding $81,000 in retainage "on the project." Byers was
8  asked, during his direct examination, "how much was still held in
9  retainage on invoices that Powerhouse had submitted to Cascade
10  General?" Tr. 265. Byers responded, "I believe it was $80,000,
11  $81,000." Id.

12    Exhibit 546 is an e-mail from Arthur to Byers dated May 3,
13  2005. In that communication, Powerhouse sought payment of the
14  "amount currently due which is $223,877.44 ($185,877.44 less
15  retainage where applicable, plus the full amount for the additional
16  LO Pump of $38,000.)" The phrase "less retainage where applicable"
17  suggests that the retainage on the unpaid invoices is some
18  unspecified amount that Cascade is entitled to withhold from some
19  currently due invoices. Even if retainage were deducted from all of
20  the invoices unpaid as of May 3, 2005, five percent of this amount
21  would only be approximately $9,294, not $81,123.

22    The evidence before me does not support a retainage deduction
23  of $81,123 from Powerhouse's award of $336,404 for the unpaid
24  invoices. Cascade has failed to establish that such a deduction is
25  appropriate.
26  ///

27

28  OPINION AND ORDER Page 3

1        2.    <u>Installation costs for new drive gear</u>

2        Cascade asserts that the court erred in failing to award as

3   damages Cascade's labor costs for replacing the used drive gear,

4   travel and per diem costs for Cascade's personnel to stay in

5   Ketchikan, Alaska, to effect the replacement, and consulting fees.

6   Cascade claims an amount totaling $103,965.

7        As evidence for its contention that Cascade incurred 770 hours

8   of labor to replace the drive gear, Cascade relies on Exhibit 145.

9   Exhibit 145 is a spreadsheet identified as a "Basic Estimate," and

10  contains a column identifying 770 as the number of hours expended

11  on replacing the used starboard main engine attached lube oil pump

12  gear. The court has not been provided with any raw data identifying

13  how many labor hours were expended on particular tasks involved in

14  replacing the drive gear, and does not even have a competent

15  summary allocating labor hours to the replacement of the pump by

16  craft.

17       Exhibit 61 is the only evidence in the record purporting to

18  explain the methodology by which Cascade tracked labor costs

19  charged to Powerhouse. That document was provided to Rick Jones as

20  back-up data for Cascade's support charges through May 25, 2005.

21  Not only does that document predate October 2005, when the gear was

22  replaced, it contains little more than multiple entries identified

23  with dates, the description "direct labor," and a number

24  representing "total hours" for that date. The exhibit does not

25  reveal even a plausible method by which Cascade could demonstrate

26  the number of hours expended on a particular task by a particular

27

28  OPINION AND ORDER Page 4

1  craft on a given date.

2      The testimony shows that neither of the two Cascade employees
3  who maintained the records for labor charges assessed against
4  Powerhouse, Byers and Nutter, was present in Alaska when the drive
5  gear was installed.

6      AETC consultant Trussell testified that he observed the work
7  done on the drive gear in Ketchikan, but he also said he arrived at
8  Ketchikan after Cascade's personnel had begun working, tr. 551, and
9  left shortly before Cascade employees finished. Id.  Trussell was
10 unsure how many Cascade employees were in Ketchikan at the time,
11 how many riggers were present, how many machinists were present, or
12 who did what tasks. Tr. 564.

13     There is no evidence directly establishing anything more than
14 a guess at the number of hours spent replacing the lube oil pump
15 gear. The lack of any evidence explaining even a methodology by
16 which Cascade arrived at the 770 labor hours claimed for the gear
17 replacement, or any other labor charges assessed against
18 Powerhouse, along with the physical absence of Byers and Nutter
19 when the gear was being replaced and the uncertainty of Trussell,
20 present only for part of the job, about how many Cascade employees
21 were present, what crafts they represented, and what work they did,
22 are fatal to Cascade's claim to compensation for 770 hours of labor
23 for replacing the gear.

24     The consulting charges for AETC, and the travel and per diem
25 costs shown on Exhibit 145 are listed as expenses related to tasks
26 performed in Ketchikan in addition to the replacement of the drive

27

28 OPINION AND ORDER Page 5

gear, including miscellaneous warranty repairs from the punch list, replacement of a leaking gasket on the port main engine attached lube oil pump, replacement of the starboard main engine attached lube oil pump driven gear, and replacement of injector leak off lines. The record provides no basis for allocating consulting charges or travel and per diem among all the tasks listed. Trussell testified that AETC was hired to provide technical assistance for the warranty repairs, not just the replacement of the drive gear, and that he "didn't look at the lube oil pump specifically." Tr. 546.

In the absence of any evidence from which the AETC consulting charges and Cascade's travel and per diem expenses can be allocated to the replacement of the drive gear, rather than all the tasks performed in Ketchikan, I decline to award damages.

I find that Cascade has failed to meet its burden of proving that it incurred $43,415 in labor costs to replace the new drive gear; $11,800 in travel and per diem costs to effect the replacement; and $27,434 in consulting costs related to the replacement of the new drive gear. I adhere to my finding that Cascade is entitled only to the cost of the new gear as damages.

Cascade's Motion to Amend (doc. # 120) is DENIED.

IT IS SO ORDERED.

Dated this 14th day of <u>February</u>, 2008.

<u>    /s/ Dennis James Hubel    </u>
Dennis James Hubel
United States Magistrate Judge

OPINION Page 6